## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

MICHAEL CLARK, KEVIN YOUNGBLOOD,
LEON JOHNSON, JAMES JACKSON,
CHARLES GADSON, et. al.,

        Defendants.

_____/

CASE NO. 05-80810
HON. LAWRENCE P. ZATKOFF

## OPINION AND ORDER

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on July 12, 2006

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I.  INTRODUCTION

This matter is before the Court on Defendants Michael Clark's, Kevin Youngblood's, Leon Johnson's, Charles Gadson's and James Jackson's Motions for Discovery of Wiretap Surveillance[1] and Motions to Suppress Contents of Intercepted Communications.[2]  The Government has responded.  The Court has denied Defendants' requests for an evidentiary hearing as to these

---

[1] See Docket Entries #112, #117, #126, #133, #167, and #200.  Regarding Defendant Johnson's Motion for Discovery (#117), Defendant's attorney indicated at the July 10, 2006 hearing that he was satisfied with the discovery provided by the Government.

[2] See Docket Entries #115, #119, #132, #157, #159, and #200.

motions.  *See* Docket #181.  Additionally, the Court conducted oral argument regarding Defendants'

Discovery Motions on July 10, 2006.  For the reasons set forth below, Defendants' Motions for

Discovery of Wiretap Surveillance and Motions to Suppress Contents of Intercepted

Communications are DENIED.

## II. BACKGROUND

### A. The Indictment

On October 6, 2005, Defendants were charged as part of a 15-defendant and 45-count

indictment filed by the Government.  Pursuant to the indictment, the Government charges that

Defendants were involved in a conspiracy to sell drugs.

### B. The Investigation

#### 1. The Confidential Informants

In December 2004, the Drug Enforcement Agency ("DEA") opened an investigation against

Defendant Michael Clark.  The investigation was based, in part, upon information obtained from

four cooperating sources ("CS1" through "CS4"), which indicated that Clark was a major marijuana

and cocaine drug trafficker operating in the Metro Detroit area.  The confidential sources supplied

the following information.

CS1 reported to agents that between 2000 and 2004, the source had observed Clark receive

large amounts of cash on more than 100 occasions, and advised agents that the cash varied from a

few thousand dollars to more than one-hundred thousand dollars on these occasions. CS1 advised

that he was aware that the money represented drug trafficking proceeds because he had observed

Clark distributing multi-kilogram quantities of cocaine on six occasions, and as recently as 2003.

CS1 also advised the agents that Clark had shown CS1 the cocaine and offered him the opportunity to sell it. In addition, CS1 advised that Clark utilizes his cellular telephones to conduct his drug trafficking business.

CS2, whom the Government asserts is a known reliable cooperating informant for more than 13 years, also related to agents that he knows Clark to be a violent and dangerous person, who utilizes his cellular telephone to conduct his drug trafficking operation, and that Clark utilizes hidden compartments to traffic drugs. CS3, another known cooperating source of information, stated that Clark utilizes hidden compartments to transport narcotics, including cocaine and marijuana, and that he has the capability to distribute approximately 100 kilograms of cocaine weekly.

CS4, a nine-year cooperating source, advised that he witnessed an individual carry a duffle bag full of money from the residence of Jose Terrell, and advised that Terrell has been observed distributing cocaine from that residence. After obtaining information from this confidential source, the agents discovered two previous investigations related to Clark.[3]

Based upon the information provided by CS1 through CS4, and that related to the two previous investigations which implicated Clark as a cocaine distributor, the agents obtained a pen register to review the toll records for Clark's telephone.  The tolls revealed that Clark routinely

---

[3] The first investigation related to an October 13, 1996 Combined Hotel Interdiction Enforcement Team ("CHIEF") Task Force investigation that revealed that Samuel Montes and Victor Vega were residing in a hotel and conducting drug trafficking activities there. CHIEF's surveillance of the individuals led them to one of Clark's homes. The Task Force witnessed the individuals carry four duffel bags from Clark's residence, and place them in the trunk of their vehicle. The duffle bags were later seized and found to contain $723,942.00, and a small amount of marijuana.

The second investigation related to a DEA Seattle investigation involving Alex Greenberg, whom advised agents that his primary source of cocaine was Samuel Montes – the individual surveilled to and from Clark's residence on October 13, 1996.

received calls to and from major drug trafficking routes, including Arizona, California, New York and Nevada. The records also revealed direct communications between Clark and certain target subjects.

### 2. The Wiretaps

Due to the sheer volume of the affidavits and applications in support of the numerous wiretaps which were authorized in this case, the Court does not believe it is necessary, or possible, to detail all of the facts supporting these applications.  Instead, for purposes of this Opinion, the Court will simply summarize those facts which led Judge Cleland to initially authorize a wiretap in this case.

On February 8, 2005, U.S. District Judge Robert H. Cleland authorized the wire interception of oral communications occurring over telephone number (313)522-4325, a prepaid telephone with an unknown subscriber, which was believed to be utilized by Defendant Clark.  DEA Special Agent Caldwell swore to an affidavit in support of the application.  The application explained that Agent Caldwell was personally involved in the investigation of Clark, and that based on the facts obtained from the investigation, there was probable cause to believe that Clark was committing drug offenses.

In support of the wire application, Agent Caldwell asserted that it would be unlikely that CS1 and CS2 – the only two sources who had seen Clark with money or narcotics – would be able to penetrate Clark's drug trafficking operation because neither had ever engaged in drug transaction with Clark and therefore were not privy to the full-scope of Clark's drug operation.  Agent Caldwell also asserted that CS3 could not be utilized in the investigation any further because he had resorted to drug trafficking again.  In addition, Agent Caldwell averred that CS4 did not know Clark, and had only provided information related to Targeted Subject Jose Terrell's drug trafficking – who

4

communicated with Clark through 55 calls during the toll analysis period.  Agent Caldwell further averred that physical surveillance of Clark's home and businesses during a 30-day period yielded no information relative to the information provided by the confidential sources. In this regard, the agent noted that "agents found it difficult to survey [Clark's] residences without being detected by [Clark's] friends or associates."  Specifically, the agent noted that during one surveillance, agents were forced to terminate the surveillance of Clark's residence when the Targeted Subjects, Doris and Khalil Stewart, exited Clark's residence and spotted the agents.

Agent Caldwell also asserted that CS1 and CS2 advised the agent that Clark was "extremely surveillance conscious," and advised that Clark conducts his own counter-surveillance through the use of multiple surveillance cameras outside his residence.  Based on these facts, Agent Caldwell assessed that physical surveillance would be unlikely to yield any information given the fact that Clark reportedly conducted his drug trafficking activities utilizing cellular telephones.

Additionally, Agent Caldwell noted that the toll records could not provide conclusive evidence of Clark's activities, that use of the Grand Jury would compromise the investigation, and that use of search warrants would be premature and alert the co-conspirators to the investigation, thereby preventing agents from identifying the full scope of the operation and those involved in it.

Based on the application and affidavit in support, Judge Cleland found that there was probable cause to believe that the Targeted Subjects were engaged in the unlawful drug trafficking activities, that normal investigative techniques had been employed and explored, but "unlikely to succeed, or [would] reasonably [be] unlikely to succeed at trial,"and that authorization of the wire would likely produce "admissible evidence of the commission of the offenses."  *See* Exhibit 3, February 8, 2005 Cleland Order, at 2.

5

Over the following months, and based on further applications and affidavits from DEA Agent Caldwell, Judge Cleland granted extensions to the initial wiretapping order and also permitted the wiretapping of four additional lines (as well as extensions regarding the wiretapping of these lines).

### III. ANALYSIS

**A. Motions for Discovery Regarding Wiretap Surveillance**

By their Motions for Discovery, Defendants request discovery of certain portions of the wiretap applications and affidavits which have been blacked out. Defendants also request discovery of certain periodic reports issued by the Government in support of the wiretaps as well as other information which may have influenced the issuing judge's determination. The Government responds by asserting that it has supplied Defendants with all legally required discoverable material, and that Defendants have failed to demonstrate a necessity for further discovery. After thoroughly reviewing the briefs of the parties as well as conducting oral arguments on this matter, the Court agrees with the Government's position.

Criminal defendants do not have a broad constitutional right to discovery. *See Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). Instead, criminal defendants are generally limited to that which may be discovered under the *Brady* rule, Rule 16, and the Jencks Act. *See United States v. Presser,* 844 F.2d 1275 (6th Cir. 1988). The Court finds that Defendants have not met their burden to show that they are entitled to the discovery requested in their Motions and accordingly, the Court HEREBY DENIES Defendants' Motions for Discovery.

Additionally, regarding the redacted portions in the wiretap applications and affidavits, the Court is satisfied that such redacted sections are related to the identity of the confidential informants

6

used in this case, and that Defendants have not shown that they are entitled to this information. The

Supreme Court explained the "informer's privilege" in *Roviaro v. United States*, 353 U.S. 53 (1957).

The privilege refers to the "the Government's privilege to withhold from disclosure the identity of

persons who furnish information of violations of law to officers charged with enforcement of that

law." *Id*. at 59 (citations omitted). The Court further explained:

> The purpose of the privilege is the furtherance and protection of the public interest
> in effective law enforcement. The privilege recognizes the obligation of citizens to
> communicate their knowledge of the commission of crimes to law-enforcement
> officials and, by preserving their anonymity, encourages them to perform that
> obligation.

*Id*. Nevertheless, the privilege gives way "[w]here the disclosure of an informer's identity, or of the

contents of his communication, is relevant and helpful to the defense of an accused, or is essential

to a fair determination of a cause. . . ." *Id*. at 60.

The Court finds that Defendants should not be permitted discovery of the redacted portions

of the wiretap applications and affidavits. Defendants have failed in their burden to show a

sufficient need for this information and the Court believes that the release of such information may

compromise the identity of the confidential informants in this case.

**B. Motions to Suppress Contents of Intercepted Communications**

18 U.S.C. § 2518(1) sets forth the procedure for intercepting telephonic communications.

It states:

> (1) Each application for an order authorizing or approving the interception of a wire,
> oral, or electronic communication under this chapter shall be made in writing upon
> oath or affirmation to a judge of competent jurisdiction and shall state the applicant's
> authority to make such application. Each application shall include the following
> information:
>> (a) the identity of the investigative or law enforcement officer making the
>> application, and the officer authorizing the application;
>> (b) ***a full and complete statement of the facts and circumstances*** relied upon

7

by the applicant, to justify his belief that an order should be issued, including
> (i) details as to the particular offense that has been, is being, or is about to be committed,
> (ii) except as provided in subsection (11), a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted,
> (iii) a particular description of the type of communications sought to be intercepted,
> (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;

(c) *a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous*;

(d) a statement of the period of time for which the interception is required to be maintained. If the nature of the investigation is such that the authorization for interception should not automatically terminate when the described type of communication has been first obtained, a particular description of facts establishing probable cause to believe that additional communications of the same type will occur thereafter;

(e) a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire, oral, or electronic communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application; and

(f) where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results.

*Id.* (Emphasis added).  Accordingly, pursuant to this statute, in order to authorize a wiretap there must be (1) probable cause, and (2) a sufficient investigatory necessity for the wiretap.

Defendants assert that the wiretap applications failed to satisfy this standard because, though they included lengthy affidavits including detailed information, they also contained conclusions which appeared to track the statute.  *See* Johnson's Brief (#119), at 4; *see also* Clark's Brief (#157), at 8.  Based on this, Defendants argue that probable cause did not exist to support the authorization of a wiretap.  Furthermore, Defendants argue that the affidavits failed to adequately show that other methods of investigation had failed and that wiretaps were a necessary part of the investigation.  The

8

Court disagrees.

A district court's order to intercept electronic communications is presumed proper. *See United States v. VanMeter*, 278 F.3d 1156, 1163 (6th Cir. 2002). A defendant bears the burden of overcoming the presumption. *Id*. Additionally, Courts will accord "great deference" to the determinations of an issuing judge when reviewing the validity of an electronic surveillance order. *United States v. Corrado*, 227 F.3d 528, 538 (6th Cir. 2000). "[T]he fact that a later trial judge or reviewing court may feel that a different conclusion was appropriate does not require, nor even authorize, the suppression of evidence gained through such a warrant." *Id*. Additionally, courts will accept a district court's factual findings, unless clearly erroneous. *See VanMeter*, 278 F.3d at 1163.

In the present case, Judge Cleland determined that there was probable cause for the initial wiretap based on the numerous factual assertions presented in Agent Caldwell's affidavit in support of a wiretap. The affidavit detailed facts from four confidential sources, a pen register, and previous investigations into Clark. The affidavit also explained why other investigation techniques had failed and why a wiretap was necessary. Based on the facts presented in the application and affidavit, the Court finds that Judge Cleland properly concluded that probable cause existed for the authorization of the initial wiretap and that the Government had satisfied the requirements of 18 U.S.C. §2518. Additionally, the Court finds that based on the facts presented in the subsequent wiretap applications and affidavits (which were in part based on facts obtained from the initial wiretap), that Judge Cleland properly determined that probable cause existed as to the subsequent wiretap applications.

For these reasons, the Court finds that the Government satisfied the requirements of 18 U.S.C. § 2518 in obtaining wiretaps in the present case. Accordingly, Defendants' Motions to Suppress the evidence obtained from these wiretaps should be denied.

9

**IV.  CONCLUSION**

For the above reasons, the Court HEREBY DENIES Defendants' Motions for Discovery of

Wiretap Surveillance and Motions to Suppress Contents of Intercepted Communications.

IT IS SO ORDERED.


s/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated:  July 12, 2006

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of
record by electronic or U.S. mail on July 12, 2006.


s/Marie E. Verlinde
Case Manager
(810) 984-3290

10